FILED
United States Court of Appeals
Tenth Circuit

October 11, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

ATLAS BIOLOGICALS, INC., a Colorado corporation,

    Plaintiff Counter Defendant - Appellee,

v.

THOMAS JAMES KUTRUBES, an individual,

    Defendant,

and

BIOWEST, LLC, a Missouri limited liability company,

    Defendant Counter Plaintiff - Appellant.

No. 20-1401

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:18-CV-00969-CMA-MEH)**

_____

Andrew B. Reid, Reid Law, LLC, Boulder, Colorado, for Defendant Counter Plaintiff - Appellant.

John D. Root, Lind Ottenhoff & Root, LLP, Windsor, Colorado, for Plaintiff Counter Defendant - Appellee.

_____

Before **HOLMES**, Chief Judge, **BALDOCK**, and **MATHESON**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

At face value, this case is about whether a stock transfer is valid under Colorado law.  But to answer this question, we must first answer certain Article III jurisdictional questions.  This dispute arises from a closely related but independent proceeding.  There, Plaintiff-Appellee Atlas Biologicals, Inc. ("Atlas") sued its former employee Thomas Kutrubes for various federal intellectual-property claims.  Mr. Kutrubes, seemingly as an attempt to thwart Atlas's ability to collect a likely judgment against him, transferred his 7% interest in Atlas to Atlas's rival Defendant-Appellant Biowest, LLC ("Biowest").  Once Atlas found out about this alleged transfer, it sought a writ of attachment in the district court against Mr. Kutrubes's interest in Atlas, which the district court granted.  But in granting the writ, the district court explained that it did not know what interest Mr. Kutrubes still had in Atlas and raised the idea of Atlas filing a separate declaratory judgment action.

Atlas did so, and that is the lawsuit before us.  And we now must decide whether the district court properly found in favor of Atlas in this action in light of the fact that it did not have an independent source of federal jurisdiction to decide the question of state law that the action presented—a question that implicated a third party not involved in the initial suit, Biowest.  Reviewing these matters de novo, we conclude that the district court acted properly and within the scope of its jurisdiction, and we further agree with the district court's resolution of the merits.  Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

2

**I**

To understand the contours of this case, one must understand the proceedings in a related case. Atlas "specializes in the production of bovine serum-based products that are used for cell culture and research in the medical, veterinary, and biological sciences." *Atlas Biologicals, Inc. v. Kutrubes* (*Atlas I*)*,* No. 15-CV-00355, 2019 WL 4594274, at *1 (D. Colo. Sept. 23, 2019) (unpublished) (footnote omitted). Mr. Kutrubes "began working for Atlas as an intern in 2005 and was hired as an employee in 2006, initially serving as a regional sales manager." *Id.* at *2. Several years later, Mr. Kutrubes became a shareholder and ultimately came to own a 7% stake in Atlas. He also was eventually promoted to National Sales Manager and was subsequently elected to Atlas's Board of Directors.

Nevertheless, Mr. Kutrubes began "developing a business plan to compete with Atlas while he was still in Atlas's employ." *Id.* In late 2014, Mr. Kutrubes began taking steps to formalize his venture, and he ultimately incorporated a business in Colorado—Peak Serum, Inc. ("Peak Serum"). Around this time and while still employed at Atlas, Mr. Kutrubes began emailing himself "certain information, documentation, and data," such as "Atlas's customer contact lists, a supplier agreement; its quality manual; its organizational chart; a contract manufacturing statement; proofs of labels; a marketing brochure; and email exchanges about Atlas's products, among others." *Id.*

However, as a part of his job description, Mr. Kutrubes had signed a document stating that he "[u]nderst[ood] and [would] adher[e] to company policies and

3

procedures," which included "a policy entitled 'Control of Confidentiality/Proprietary Information' that prohibited all employees from disclosing without the company's prior written authorization any 'Confidential and/or Proprietary Information.'" *Id.* (first alteration in original). He also sent emails to Atlas's customers and suppliers in an attempt to secure business for Peak Serum. Mr. Kutrubes later admitted that he breached his duty of loyalty to Atlas during this time.

On December 16, 2014, Mr. Kutrubes tendered his resignation letter, with an intended effective date of December 19. He also requested the company to buy out his 7% stake for $224,000.00 based on "the recent appraisal of the company at $3,200,000.00." *Id.* A few days after Mr. Kutrubes gave notice of his resignation, Atlas discovered that Mr. Kutrubes had been sending company documents to his personal email account and had been attempting to solicit Atlas's clients and suppliers. As a result, "Atlas 'decline[d] [Mr. Kutrubes's] resignation' and 'instead terminate[d] his directorship and employment for cause' on December 27, 2014." *Id.* at *3 (first and third alterations in original). In a letter detailing its findings, Atlas demanded Mr. Kutrubes cease using all materials obtained from Atlas, return those materials to the company, abandon all plans to start a similar business as Atlas, and surrender all shares to Atlas.

On February 20, 2015, Atlas sued Mr. Kutrubes and Peak Serum in the District of Colorado. After more than a year of discovery, Atlas filed an amended complaint in which it asserted various intellectual-property claims, such as claims for federal

4

trademark infringement and misappropriation of trade secrets.  The district court

conducted a five-day bench trial between March 5, 2018, and March 9, 2018.

On April 4, 2018, Mr. Kutrubes purportedly sold his 7% interest in Atlas to

Biowest.  *See* Aplt.'s App., Vol. II, at 46–50 (Stock Sale and Purchase Agreement,

executed Apr. 4, 2018).  The next day, Mr. Kutrubes, through counsel, notified Atlas that

he had sold his shares to Biowest.  "Biowest did not receive delivery of an indorsed

certificate for [Mr.] Kutrubes's shares," because "Atlas had not created stock certificates

for [Mr.] Kutrubes's shares at the time of the Purported Transfer," and only did so after

Mr. Kutrubes had transferred the shares.  *Atlas Biologicals, Inc. v. Kutrubes* (*Atlas II*),

474 F. Supp. 3d 1188, 1192 (D. Colo. 2020).

In response, Atlas filed "an Emergency *Ex Parte* Motion for Pre-Judgment

Attachment and Injunctive Relief Against Further Conveyances of Assets by [Mr.]

Kutrubes," in which it argued the "transfer was unsuccessful (i.e., not completed) because

'no endorsed share certificate ha[d] been tendered nor a request for a transfer on the

books and records of Atlas . . . ha[d] been made.'"  *Atlas I*, 2019 WL 4594274, at *5

(second and third alterations and omission in original) (quoting Atlas's emergency

motion).  And Atlas requested, as relief, "prejudgment attachment of [Mr.] Kutrubes's

shares of its stocks pursuant to Colorado Rule of Civil Procedure 102(c)."  *Id.*  In

response, Mr. Kutrubes argued he had successfully transferred his stock to Biowest and

requested an "injunction preventing Atlas and its shareholders [and] officers . . . from

holding any shareholder meetings, amending corporate bylaws, or otherwise taking

actions that would impact any minority shareholder until such time as the dispute with

respect to ownership of shares is resolved." *Id.* (alteration and omission in original). The district court "issued a Writ of Attachment on April 24, 2018, that ordered the Sheriff of Larimer County, Colorado, to 'attach and safely keep any stock of [Atlas] owned by [Mr. Kutrubes].'" *Id.* (first alteration in original) (quoting writ of attachment).

The district court nevertheless noted at the hearing concerning the issuance of the writ of attachment, that it did not know whether the transfer of stock was valid—whether it had been "consummated in full." Aplt.'s App., Vol. IV, at 144. Because of this uncertainty as to the validity of the transfer, the district court told the parties the following:

> So I am going to issue an order of pre-judgment attachment as to whatever interest remains in Mr. Kutrubes for the 7 percent of stock that he owns in Atlas. I don't know what that is, and that is not going to be decided by me *unless you all file a separate action in this Court for either declaratory judgment or for further undoing the fraudulent conveyance*.

*Id.* (emphasis added). Atlas "informed the Court that it had served the Writ of Attachment on [Mr.] Kutrubes on May 3, 2018, and that it had 'surrendered [Mr. Kutrubes's] stock certificates to the Larimer County Sheriff on May 9, 2018.'" *Atlas II*, 474 F. Supp. 3d at 1191.

The next day, Atlas sued Biowest and Mr. Kutrubes. Atlas sought "declaratory relief pursuant [to] Fed. R. Civ. P. 57 to void the purported transfer of stock [from Mr. Kutrubes to Biowest] under Article 8 of the Colorado Uniform Commercial Code

6

[i.e., CUCC] or, in the alternative, to avoid and recover a fraudulent transfer pursuant to the Colorado Uniform Fraudulent Conveyances Act C.R.S. §§ 38-8-101[,] *et seq.* (CUFTA)." *Id*.

On June 25, 2018, Biowest filed a motion to dismiss Atlas's claims pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that the district court lacked subject-matter jurisdiction over the case and that Atlas lacked standing to sue Biowest. *See Atlas II*, No. 18-CV-00969, 2019 WL 1200809, at *2, *4 (D. Colo. Mar. 14, 2019) (unpublished). Biowest also argued that, if the district court indeed had subject-matter jurisdiction, the suit should be dismissed for failure to state a claim.

The district court rejected Biowest's argument "that the Court does not have ancillary jurisdiction over the action because it is 'separated' from the Primary Suit [i.e., *Atlas I*], relies on state claims, and lacks 'an independent federal jurisdiction basis.'" *Id.* at *5. The district court explained that "this case 'involves the second, less common purpose—ancillary jurisdiction over collateral proceedings,'"; that is, jurisdiction "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* at *5–6 (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994)). Therefore, the court reasoned that it was "satisfied that it has ancillary jurisdiction over" Atlas's claims because Atlas "seeks to avoid an allegedly fraudulent transfer of stock to

Defendant Biowest, LLC from Defendant Kutrubes, against whom [Atlas] seeks a judgment in the Primary Suit [i.e., *Atlas I*]."[1]  *Id.* at *6.

Next, the district court concluded that Atlas indeed had standing to sue Biowest for a declaratory judgment to void the transfer.  Because the declaratory judgment was ostensibly brought under Colorado's Uniform Declaratory Judgments Law, Colo. Rev. Stat. §§ 13-51-101, *et seq.*, the district court looked to Colorado's law of standing, which states that "a plaintiff must assert a legal basis on which a claim for relief can be grounded.  The plaintiff must allege an injury in fact to a legally protected or cognizable interest."  *Atlas II*, 2019 WL 1200809, at *7 (quoting *Farmers Ins. Exch. v. Dist. Ct. for the Fourth Jud. Dist.*, 862 P.2d 944, 947 (Colo. 1993)).  And the district court explained that under Colorado law a declaratory judgment was appropriate "when the rights asserted by the plaintiff are present and cognizable ones . . . [and] a declaratory judgment would effect a change in the plaintiff's present rights or status."  *Id.* (emphasis omitted) (quoting *Farmers Ins. Exch.*, 862 P.2d at 947).

With this in mind, the district court concluded that Atlas had standing to sue "because the declaratory judgment that it seeks—that purported transfer of stock

---

[1]    The district court did find that it did not have jurisdiction over Atlas's claim for "civil conspiracy," because it is an "entirely new and original" theory of liability, and the Supreme Court has "cautioned against the exercise of jurisdiction over proceedings that are 'entirely new and original' . . . or where 'the relief sought is of a different kind or on a different principle' than that of the prior decree." *Atlas II*, 2019 WL 1200809, at *6 (omission in original) (quoting *Peacock v. Thomas*, 516 U.S. 349, 358 (1996)).

from Defendant [Kutrubes] to Defendant Biowest, LLC 'is void and of no effect,' . . . would effect a change in its present rights or status." *Id.* at *8. Specifically, the district court explained that Atlas's status as issuer of the stock is affected by whether the transfer was valid because if it was valid, Atlas would be required to register the transfer. And also, the writ of attachment was predicated on an understanding that the transfer was invalid and Atlas had already surrendered the shares to the Larimer County police department. *Id.*[2]

On April 19, 2019, Atlas moved for summary judgment on its claim for declaratory relief to void the stock transfer. In response, Mr. Kutrubes argued that

---

[2]    The district court also denied Biowest's motion to dismiss as to Atlas's first three claims. First, it concluded that Atlas had stated a claim for a declaratory judgment against Biowest and Mr. Kutrubes because it "alleges that the transfer of stock from Defendant Kutrubes to Defendant Biowest, LLC was ineffectual under the [C]UCC because Defendant Biowest, LLC does not possess a stock certificate and Plaintiff has not registered any certificate in Defendant Biowest, LLC's name." *Atlas II*, 2019 WL 1200809, at *9. Second, the district court concluded that Atlas had stated a claim for actual fraud, because Mr. Kutrubes transferred "his shares 'with the actual intent to hinder, delay, or defraud [Plaintiff].'" *Id.* (alteration in original). The district court also explained that Atlas could bring this claim against Biowest because "CUFTA allows for a judgment 'against a person other than the debtor' if that person 'also acts with wrongful intent'" and "Defendant Biowest, LLC acted with actual intent to defraud Plaintiff" when it accepted the transfer with knowledge of the ongoing trial and the likelihood of a judgment against Mr. Kutrubes. *Id.* at *10. Lastly, the district court concluded that Atlas had stated a constructive fraud claim against Mr. Kutrubes and Biowest. Although noting that "the citations to CUFTA's remedy provisions in Plaintiff's Complaint are significantly flawed," it explained that Plaintiff has adequately alleged that Defendant Biowest, LLC may be liable for a judgment for the value of the stocks transferred pursuant to Section 38-8-109(2). *Id.* at *10–11. Section 38-8-109(2) states that an aggrieved creditor "may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less," and that this judgment may be entered against "[t]he first transferee of the asset." *Id.* at *11 (alteration and omission in original) (quoting Colo. Rev. Stat. § 38-8-109(2), -109(2)(a)).

"the transfer was valid because Defendants substantially complied with the [C]UCC and an equitable transfer of stock occurred." *Atlas II*, 474 F. Supp. 3d at 1191–92. And Biowest, for its part, "argue[d] that Plaintiff's Motion should be denied because, *inter alia*, Article 8 of the [C]UCC is irrelevant to the transfer of ownership of stock and an equitable transfer of stock occurred." *Id.* at 1192. However, the district court granted summary judgment in favor of Atlas. At the outset, it did reject Atlas's arguments that the shares were certificated securities because its bylaws required its stock certificate to be "certificated"; instead, the district court found that the shares were uncertificated securities at the time of the transfer because Atlas only created the stock certificates for the shares after the alleged transfer. *Id.* at 1193.

Yet, concluding that "Article 8 of the [C]UCC governs the Purported Transfer and its delivery requirements must be satisfied for legal ownership of stock to transfer," the district court found that the transfer did not meet the requirements for delivery of uncertificated securities under Article 8. *Id.* at 1194. The [C]UCC provides that delivery of an uncertificated security to a purchaser occurs when either of the following conditions is satisfied: (1) "The issuer registers the purchaser as the registered owner, upon original issue or registration of transfer; or (2) Another person, other than a securities intermediary, either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser." *Id.* (quoting Colo. Rev. Stat. § 4-8-301 (2019)).

The district court concluded that neither of the foregoing two conditions was met. The district court determined that the first condition was not satisfied because Atlas did not register Biowest as the registered owner of the security and rejected Biowest's argument that Atlas's purported obligation to register satisfied this condition. Next, the district court explained that the second condition—which, as applied here, would mean that Mr. Kutrubes held the stock for Biowest—was not satisfied, because Atlas never received any statement that Mr. Kutrubes held the stock for the benefit of Biowest. And Mr. Kutrubes indicated he was the owner of the stock and did not mention that he owned it for the benefit of Biowest when he made a shareholder request to Atlas on June 18, 2019.[3] Because Biowest did not satisfy either condition for delivery of uncertificated securities, the district court concluded that "ownership of [Mr.] Kutrubes's stock did not transfer to Biowest." *Id.* at 1195.

The district court also rejected the contention that the stock had been equitably transferred to Biowest. Even though, reasoned the court, "Colorado recognizes equitable transfer of corporate stock and that the adoption of the [C]UCC does not abrogate the principle allowing such equitable transfer, 'equitable title claims are recognized in Colorado only where the rights of third parties would not be affected,'"

---

[3]      Specifically, on that date in June 2019, Mr. Kutrubes provided a signed and dated form to Atlas stating that he was a current shareholder of Atlas, and had been so for nine years, and that he owned 52,689 shares. He sought to examine certain financial records of the company to "review and ascertain the value of [his] shares and the financial status of the company." Aplt.'s App., Vol. II, at 265.

and the court concluded that the doctrine did not apply here because the claim would affect Atlas's rights as a third party. *Id.* (quoting *Mortg. Invs. Corp. v. Battle Mountain Corp.* (*Mortg. Invs. II*), 93 P.3d 557, 560 (Colo. Ct. App. 2003)). Therefore, the district court granted summary judgment on Atlas's declaratory judgment claim that the stock transfer was void.

On September 18, 2020, upon a stipulated motion by the parties, the district court certified its order as final pursuant to Fed. R. Civ. P. 54(b) and entered a final judgment pursuant to Fed. R. Civ. P. 54(b) on the declaratory judgment claim. *See* Aplt.'s App., Vol. III, at 153–55 (order on certification of finality); *id.* at 156 (Final Judgment). And, following the grant of an extension on the Fed. R. Civ. P. Rule 4 appeal deadline, Biowest filed its Notice of Appeal. *See id.* at 157–64 (motion for extension); *see also id.* at 169–71 (Corrected Notice of Appeal).

Notably, a few days after the court certified its order in the instant case as final, the district court in *Atlas I* entered judgment "in favor of Atlas [] on its claims for federal trademark infringement; Colorado common law trademark and trade name infringement; misappropriation of trade secrets; and breach of fiduciary duty." *Atlas I*, 2019 WL 4594274, at *23. Specifically, the district court ordered "that a final judgment shall be entered against Defendants Thomas James Kutrubes, Peak Serum, Inc., and Peak Serum, LLC in the amount of $2,048,180.50."[4] *Id.* And Mr. Kutrubes

---

[4] At oral argument, we questioned the parties about how the outcome of Mr. Kutrubes's appeal would affect the supplemental enforcement jurisdiction of the district court at issue in this appeal. Both parties seemed to agree that if the panel in *Atlas I* reversed the district court's judgment in its entirety, such that there would be

12

and his companies appealed. *See Atlas I*, No. 19-1404, 2022 WL 2840484 (10th Cir. July 21, 2022) (unpublished). In a recently issued unpublished decision, a panel of our court affirmed the district court's judgment. *Id.* at *1, *9.

## II

This appeal presents three issues. First, we must decide whether the district court properly extended supplemental ancillary jurisdiction to the proceedings initiated by Atlas. Second, we must determine whether Atlas had standing to sue Biowest even though Biowest was not a party in the original litigation. Because we answer both of these inquires in the affirmative, we last turn to the underlying merits of this suit—whether the stock transfer between Mr. Kutrubes and Biowest was consonant with Colorado law. We conclude it was not; it is therefore void. Therefore, we affirm the district court's grant of summary judgment in favor of Atlas.

## A

We first turn to whether the district court had subject-matter jurisdiction to hear this case. We begin by outlining what is required for federal courts to have jurisdiction and sketch the contours of when courts may possess supplemental

---

no judgment against Mr. Kutrubes, this case would be moot and there would be no ancillary enforcement jurisdiction. But, as noted, that did not happen. The panel who heard Mr. Kutrubes's appeal affirmed the district court's judgment. *See Atlas I*, No. 19-1404, 2022 WL 2840484, at *1,*9 (10th Cir. July 21, 2022) (unpublished). Therefore, because there remains an outstanding judgment against Mr. Kutrubes, this case is not moot and, as will be discussed below, the district court properly exercised ancillary enforcement jurisdiction over Atlas's claim in this case.

jurisdiction over claims that traditionally fall outside the ambit of federal jurisdiction. This will be followed by further discussion of the species of supplemental jurisdiction that we have before us: ancillary enforcement jurisdiction. Next, we will conclude that this case was indeed within the district court's ancillary enforcement jurisdiction. And finally, we will consider Biowest's arguments to the contrary.

**1**

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . which is not to be expanded by judicial decree." *Kokkonen*, 511 U.S. at 377 (citations omitted); *see Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978) ("It is a fundamental precept that federal courts are courts of limited jurisdiction. The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded."). Accordingly, "[i]t is to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citation omitted); *see also McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 182 (1936) ("It is incumbent upon the plaintiff properly to allege the jurisdictional facts, according to the nature of the case."); *id.* at 189 ("[The plaintiff] must allege in his pleading the facts essential to show jurisdiction.").

"But sometimes the federal courts are permitted to entertain a *claim* or an *incidental proceeding* that does *not* satisfy requirements of an independent basis of subject matter jurisdiction." 13 Charles Alan Wright & Arthur R. Miller,

FEDERAL PRACTICE AND PROCEDURE § 3523.2 (3d ed.), Westlaw (database updated May 2022). This "supplemental jurisdiction" is most commonly used in the context of extending jurisdiction over non-federal question or non-diverse claims asserted in federal court. For example, "in any civil action of which the district courts have original jurisdiction," § 1367 of Title 28 permits federal courts to exercise supplemental jurisdiction over certain claims that do not independently satisfy the requirements for subject-matter jurisdiction, stating the following: "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

But there is another species of supplemental jurisdiction—ancillary or ancillary enforcement jurisdiction—that allows federal courts to extend jurisdiction over "related *proceedings* that are technically separate from the initial case that invoked federal subject matter jurisdiction." 13 Wright & Miller, *supra*, § 3523.2. The Supreme Court explained "that a federal court may exercise ancillary jurisdiction '(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.'" *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (quoting *Kokkonen*, 511 U.S. at 379–380).

**2**

We focus on this second form of supplemental jurisdiction—ancillary enforcement jurisdiction. Because we have previously described ancillary enforcement jurisdiction as an "ill-defined concept," we pause here to provide some clarity to an otherwise nebulous aspect of our federal courts' jurisdiction. *Sandlin v. Corp. Interiors Inc.*, 972 F.2d 1212, 1215 (10th Cir. 1992) (quoting 6 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1444 (2d ed. 1990)). Not governed by 28 U.S.C. § 1367, ancillary enforcement jurisdiction is a creature of the common law and thus is governed by caselaw. *See Boim v. Am. Muslims for Palestine,* 9 F.4th 545, 551 (7th Cir. 2021) ("Congress codified much of the first category in the supplemental jurisdiction statute, 28 U.S.C. § 1367, while the latter category—at times called 'ancillary enforcement jurisdiction'—remains grounded in federal common law."); *Butt v. United Brotherhood of Carpenters & Joiners of Am.*, 999 F.3d 882, 886–87 (3d Cir. 2021) ("Unlike the sources of jurisdiction conferred by 28 U.S.C. § 1367, ancillary enforcement jurisdiction focuses on 'the power [of federal courts] to enforce their judgments and ensur[es] that they are not dependent on state courts to enforce their decrees.'" (alterations in original) (footnote omitted) (quoting *Nat'l City Mortg. Co. v. Stephen*, 647 F.3d 78, 85 (3d Cir. 2011))); *Nat'l City Mortg. Co.*, 647 F.3d at 85 ("'Ancillary enforcement jurisdiction is . . . a creature of necessity,' . . . giving federal courts the power to enforce their judgments and ensuring that they are not dependent on state courts to enforce their decrees. Ancillary jurisdiction is a common law doctrine that survived

16

the codification of supplemental jurisdiction in 28 U.S.C. § 1367." (first omission in original) (citations omitted) (quoting *Peacock*, 516 U.S. at 359)).

We have explained that "[a]ncillary jurisdiction rests on the premise that a federal court acquires jurisdiction of a case or controversy in its entirety." *Jenkins v. Weinshienk*, 670 F.2d 915, 918 (10th Cir. 1982). In line with this proposition, we have explained that "a court may decide collateral matters necessary to render complete justice," *id.*, and "[w]ithin a federal court's ancillary jurisdiction is the power to conduct proceedings necessary to protect and give effect to its judgments," *Sandlin*, 972 F.2d at 1216. *See Peacock*, 516 U.S. at 354 (explaining ancillary jurisdiction "enable[s] a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees" (quoting *Kokkonen*, 511 U.S. at 379–80)); *see also Loc. Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934) ("That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled."); 13 Wright & Miller, *supra*, § 3523.2 (explaining that a district court "may hear collateral proceedings when necessary to allow it to vindicate its role as a tribunal"). Therefore, "if a federal court had jurisdiction of the principal action, it may hear an ancillary proceeding, regardless of the citizenship of the parties, the amount in controversy, or any other factor that normally would determine subject matter jurisdiction." 13 Wright & Miller, *supra*, § 3523.2.

17

But the matter of which ancillary proceedings fall within this form of supplemental jurisdiction is less clear. The Supreme Court has "approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances." *Peacock*, 516 U.S. at 356. Thus, while it is "[w]ithout doubt [that] a federal court has jurisdiction to enjoin actions that threaten to interfere with an order it has entered," 13 Wright & Miller, *supra*, § 3523.2, the Supreme Court nevertheless has outlined certain types of enforcement proceedings that do not fall within the ambit of supplemental ancillary jurisdiction. For example, in *Kokkonen*, the Supreme Court explained that ancillary jurisdiction does not extend to a breach of a settlement agreement that arose from a stipulation of dismissal under Federal Rule of Civil Procedure 41(a)(1)(ii), which did not reserve jurisdiction to the district court to enforce the agreement or even refer to the settlement agreement. 511 U.S. at 376–78. The Court explained that "the power asked for here is quite remote from what courts require in order to perform their functions," because "the terms of the settlement agreement had [not] been made part of the order of dismissal" and therefore, "the only order here was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged breach of the settlement agreement." *Id.* at 380–81.

The Court recognized another boundary by holding that ancillary supplemental jurisdiction did not extend to enforcing a judgment for breach of fiduciary duties

18

against a third party who was found by the district court not to be a fiduciary. *Peacock*, 516 U.S. at 357–60.  The Court explained that it has never recognized extending supplemental jurisdiction "beyond attempts to execute, or to guarantee eventual executability of, a federal judgment," and it has "never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment *on a person not already liable for that judgment*." *Id.* at 357 (emphasis added); *see H.C. Cook Co. v. Beecher,* 217 U.S. 497, 498–99 (1910) (concluding that a plaintiff could not collect on the judgment by suing the individual directors of the defendant corporation, alleging that they had authorized and knowingly permitted the corporation to become insolvent, because the suit was not ancillary to the judgment in the former suit).  Further, the Court "cautioned against the exercise of jurisdiction over proceedings that are "'entirely new and original,'" or where 'the relief [sought is] of a different kind or on a different principle' than that of the prior decree." *Peacock*, 516 U.S. at 358 (alteration in original) (first quoting *Krippendorf v. Hyde*, 110 U.S. 276, 285 (1884); and then quoting *Dugas v. Am. Sur. Co. of New York*, 300 U.S. 414, 428 (1937)).

Notably, in *Ellis v. All Steel Construction, Inc.*, however, we made clear that the third-party boundary of "*Peacock . . .* is not implicated in actions to reach and collect assets of the judgment debtor held by a third party; it is only when the plaintiff seeks to hold the third party *personally liable* on the judgment that an independent jurisdictional basis is required."  389 F.3d 1031, 1034 (10th Cir. 2004) (emphasis added).  This distinction is evident from the fact that *Peacock* itself

19

explicitly recognized "the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—includ[ed] attachment, . . . and the *prejudgment avoidance of fraudulent conveyances*."  516 U.S. at 356 (emphasis added).

Our sister circuits likewise have interpreted *Peacock* as not affecting the ability of federal courts to hear ancillary proceedings to enforce judgments against third parties.  *See Nat'l Mar. Servs., Inc. v. Straub*, 776 F.3d 783, 787 (11th Cir. 2015) ("In contrast with *Peacock*, the district court had ancillary jurisdiction over this supplementary proceeding because [plaintiff] sought to disgorge [defendant] of a fraudulently transferred asset, not to impose liability for a judgment on a third party.  Unlike the defendant in *Peacock*, [defendant] is not personally liable for the judgment against [a separate defendant in the primary action] . . . [defendant in the supplemental action's] liability is limited instead to the proceeds that [defendant in the primary action] fraudulently transferred to him."); *Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 106–07 (2d Cir. 2001) (concluding that the district court had ancillary enforcement jurisdiction where one party only attempted to void the allegedly fraudulent conveyances of defendant to and among other defendant parties, in order to ensure the plaintiff's collectability of the default judgment); *Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1454–55 (9th Cir. 1996) (distinguishing plaintiffs' fraudulent conveyance claims from the veil-piercing claim at issue in *Peacock*, and holding that a district court has enforcement jurisdiction over a judgment creditor's fraudulent conveyance claims against transferees who were not

20

parties to the underlying action); *see also Gambone v. Lite Rock Drywall*, 288 F.
App'x 9, 12 (3d Cir. 2008) (unpublished) ("[A]ncillary jurisdiction lets prevailing
litigants go to the District Court that entered their judgment for help in resolving
matters related to its enforcement.  Accordingly, so long as the plaintiffs' demand for
injunctive relief qualifies as a post-judgment enforcement proceeding, which is a
proceeding that functions as a means for executing a judgement, the District Court
has subject matter jurisdiction").

**3**

We conclude that the district court had ancillary subject matter jurisdiction
over Atlas's declaratory judgment claim to void the stock transfer to Biowest.  In
*Atlas I*, the district court issued a writ of attachment, and concluded that "whatever
Atlas [] stock that Defendant Thomas James Kutrubes owns is subject to attachment .
. . ," and commanded the Sheriff of Larimer County to "attach and safely keep any
stock of Atlas [] owned by Defendant Thomas James Kutrubes."  Aplt.'s App., Vol.
IV, at 92 (Writ of Attachment, filed Apr. 24, 2018).  Atlas filed this suit, seeking
declaratory relief, to "void the purported transfer of stock under Article 8 of the
[CUCC] or, in the alternative, to avoid and recover a fraudulent transfer pursuant to
the Colorado Uniform Fraudulent Conveyances Act . . . ."  Aplt.'s App., Vol. II, at 4
(Amended Complaint, filed Mar. 18, 2019).  The district court concluded that it
indeed had jurisdiction over "these three claims [because] Plaintiff seeks to avoid an
allegedly fraudulent transfer of stock to Defendant Biowest, LLC from Defendant
Kutrubes, against whom Plaintiff seeks a judgment in the Primary Suit [i.e., *Atlas I*]."

*Atlas II*, 2019 WL 1200809, at *6. Specifically, it explained these claims are "within the scope of the ancillary enforcement jurisdiction of this Court." *Id.*

The district court is correct. To be sure, the nature of this case is unique. But it nevertheless falls within the core of those situations under which ancillary enforcement jurisdiction appropriately extends to third parties. As mentioned above, we have concluded that "[w]ithin a federal court's ancillary jurisdiction is the power to conduct proceedings necessary to protect and give effect to its judgments." *Sandlin*, 972 F.2d at 1216. And we have made clear that ancillary enforcement jurisdiction is appropriate in actions "to reach and collect assets of the judgment debtor held by a third party." *Ellis*, 389 F.3d at 1034; *cf. Peacock*, 516 U.S. at 357 (noting the Court has never recognized extending supplemental jurisdiction "beyond attempts to execute, or to guarantee eventual executability of, a federal judgment").

Most relevant here, the Supreme Court has approved of the exercise of supplemental jurisdiction over a claim to avoid a fraudulent transfer of assets to a third party. *See Dewey v. W. Fairmont Gas Coal Co.*, 123 U.S. 329, 332–33 (1887) (concluding that the district court had ancillary jurisdiction over a suit brought under West Virginia law allowing "a creditor, before obtaining a judgment or decree for his claim, [to] institute any suit to avoid a gift, conveyance, assignment, or transfer . . . ."); *cf. Riggs v. Johnson Cnty.*, 73 U.S. (6 Wall.) 166, 187 (1867) ("Process subsequent to judgment is as essential to jurisdiction as process antecedent to judgment, else the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.").

22

Although this case concerns the predicate issue of whether any sort of transfer actually occurred, deciding this question through a declaratory judgment is essential to the district court deciding the entire case before it. That is, whether the transfer to Biowest was effective under Colorado law determines whether the district court's writ of attachment attached to anything at all. This is true even though Biowest is not mentioned in the writ of attachment ordered by the district court, because the relief sought by Atlas in this case against Biowest is necessarily tied to vindicating the relief already ordered in the principal action (i.e., *Atlas I*) against Mr. Kutrubes.

Unlike in *Peacock*, the district court had ancillary jurisdiction over this proceeding because Atlas asked the district court to answer the question about the validity of the transfer and thus the writ of attachment—not to impose liability on a third party. *See Epperson*, 242 F.3d at 107 ("In the present proceeding, Appellants seek only to void the allegedly fraudulent conveyances of [judgment debtor] to and among [third parties] in order to ensure the collect[a]bility of the default judgment against [judgment debtor]. Their fraudulent conveyance claims do not seek to hold [third parties] liable for the existing judgment . . . . Accordingly . . . Appellants' claims for fraudulent conveyance were within the scope of the enforcement jurisdiction of the district court." (footnotes omitted)). Thus, in order to fully effectuate the district court's order attaching "whatever Atlas [] stock that Defendant Thomas James Kutrubes owns," the district court must determine the validity of any transfer to Biowest of the attached property under Colorado law and, relatedly, whether Atlas was obligated to register the shares purportedly transferred to Biowest.

23

Therefore, this is the very sort of proceeding that would allow the district court to decide the entire case and assure that its judgments are followed—*viz.*, the type of case that fits nicely and properly within the compass of ancillary enforcement jurisdiction.

**4**

Biowest's arguments to the contrary are unavailing. First, Biowest argues that Atlas only invoked 28 U.S.C. § 1367's supplemental jurisdiction and did not allege common law ancillary jurisdiction. *See* Aplt.'s Opening Br. at 17–20. And, because it "was Atlas's duty to assert the proper jurisdictional basis for its claims and it failed to assert common law ancillary jurisdiction," the "District Court should not have considered that as a basis for its jurisdiction." *Id.* at 22. Biowest correctly observes that "[t]he burden of establishing subject matter jurisdiction is on the party asserting jurisdiction." Aplt.'s Reply Br. at 1 (quoting *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008)). Consequently, when a party championing subject-matter jurisdiction "fails to lead" in identifying the proper jurisdictional theory, "we have no *duty* to follow." *Raley v. Hyundai Motor Co., Ltd.*, 642 F.3d 1271, 1275 (10th Cir. 2011) (emphasis added). In other words, in such circumstances, a federal court is not obliged "to conjure up possible theories" to support subject-matter jurisdiction. *Id.*; *see, e.g.*, *Patrick G. by & through Stephanie G. v. Harrison Sch. Dist. No. 2*, 40 F.4th 1186, 1214–15 (10th Cir. 2022) ("[The plaintiffs] make no meaningful argument—supported by authority or even logic—for why this claim is viable (i.e., not moot) . . . . At the end of the day, the [the

24

plaintiffs] must convince us that jurisdiction is present, and we will not make arguments in this respect for them.").

That does not mean, however, that—when a party stumbles and falls in advancing the jurisdictional ball—federal courts lack the *discretion* to identify a valid theory to support their jurisdiction. More specifically, just as federal courts have the "discretion *to decline* to consider . . . arguments that might have supported" jurisdiction, where a jurisdictional proponent fails to properly advance them, it logically follows that they have the discretion to *consider* such jurisdiction-supportive arguments in a like situation. *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1518 n.2 (10th Cir. 1996), *superseded by statute on other grounds,* False Claims Act, Pub. L. No. 111-203, 124 Stat. 1376, *as recognized in U.S. ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764–65 (10th Cir. 2019) (emphasis added); *see Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992) ("[W]e may depart from the general waiver rule [to consider arguments supportive of subject-matter jurisdiction] *in our discretion*, particularly when we are presented with a strictly legal question the proper resolution of which is beyond doubt or when manifest injustice would otherwise result." (emphasis added)); *cf.* 13D Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 3567.3 (3d ed.), Westlaw (database updated April 2022) ("[R]efusing to exercise [supplemental] jurisdiction under [28 U.S.C.] § 1367(c) is a *discretionary*—and not a jurisdictional—decision." (emphasis added)). Stated otherwise, where a federal court's subject-matter jurisdiction is challenged, as here—while independently

25

assessing whether there is a proper basis for jurisdiction—a federal court is not limited to the jurisdictional theories that the jurisdictional proponent advances. To the contrary, it has the discretion to identify a proper ground for subject-matter jurisdiction that the proponent did *not* identify. That is precisely the discretion that the district court exercised here, and we have no reason to think that the court abused its discretion.

Furthermore, the authority identified by Biowest underscores that the burden shouldered by the party asserting jurisdiction is to properly plead—and, at the appropriate procedural juncture, actually produce evidence of—facts supporting federal jurisdiction. *See, e.g.*, *Port City Props.*, 518 F.3d at 1189. Here, although it appears to be uncontested that Atlas mistakenly pointed to 28 U.S.C. § 1367 for the source of supplemental jurisdiction, Atlas nevertheless alleged sufficient facts to support ancillary common law jurisdiction—thereby, shouldering (at least in material respects) its jurisdictional burden. *See* Aplt.'s App., Vol. I, at 17–35 (Complaint, filed Apr. 25, 2018). Most relevant, Atlas pleaded that Mr. Kutrubes admitted that he knew that a judgment would be entered against him in the other case (i.e., *Atlas I*); Mr. Kutrubes purportedly then transferred his shares to Biowest; Atlas sought a writ of attachment against Mr. Kutrubes's stock; and Atlas had not received valid instructions to register the shares. *See* Aplt.'s App., Vol. II, at 7–11, 13. In support of its allegations, Atlas filed multiple exhibits comprised of documents from the original case detailing the back and forth between the parties regarding the purported stock transfer to Biowest and filings regarding the writ of attachment. *See id.* at 21–

26

61; *cf. Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits . . . and documents incorporated into the complaint by reference . . . ." (citations omitted)).  Although Atlas inexplicably did not mention in its amended complaint that the writ of attachment was indeed granted, it provided sufficient facts to show that the district court had supplemental ancillary jurisdiction to hear its case.

Next, Biowest argues that, although it "does not contest a federal district court's *equitable* jurisdiction to enforce its orders and judgments," Biowest "does contest the District Court's assumption of ancillary subject matter jurisdiction over claims *at law* in a separate action."  Aplt.'s Opening Br. at 23; *see* Aplt.'s Reply Br. at 7 (arguing "equitable ancillary enforcement claims (including a properly plead CUFTA claim) cannot provide a jurisdictional basis for the declaratory judgment claim on the contract, also a claim at law rather than equity, even if considered together").  But Biowest points to no authority that shows that this distinction matters.  *Cf. Hunt*, 292 U.S. at 239 ("That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, *whether at law or in equity*, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled." (emphasis added)).  And when considering ancillary enforcement jurisdiction's purpose to enable courts to effectuate their orders, the law and equity distinction is seemingly inapposite; it is not consonant with comprehensively achieving the purpose of ancillary jurisdiction.

27

In line with this, Biowest's arguments that Atlas's declaratory judgment is necessarily "new and original," because it arises as a claim at law, fails. Aplt.'s Opening Br. at 25–26 (quoting *Peacock*, 516 U.S. at 358). Specifically, in an attempt to argue that the declaratory judgment concerns a "new and original" claim, Biowest contends that "the Agreement and Assignment was executed and the Shares transferred *prior* to the entry of the *Atlas One* Writ which ran against only Atlas stock, if any, held by [Mr.] Kutrubes at the time of entry, and therefore did not cover the previously transferred Shares." *Id.* at 24. But this attempt to show that the dispute is "new and original" actually frames how this dispute relates to the original case, and it simply papers over the question that the district court used its supplemental ancillary jurisdiction to decide: that is, whether there actually was a legally effective transfer of shares by Mr. Kutrubes in the first place and, by extension, whether any such transfer actually did occur *prior to* the issuance of the writ of attachment. The fact that the answer to this question—which relates to the utility of the writ of attachment issued in *Atlas I* to enforce the district court's judgment in that case—requires looking to Colorado law does not make this a "new or original" suit, disconnected from *Atlas I*. Instead, this lawsuit is compatible with the general aim of ancillary jurisdiction to allow courts to decide an entire case without requiring litigants to start over in state court. Thus, Biowest cannot show that the nature of this case puts it outside of the proper bounds of a federal court's supplemental jurisdiction. The district court correctly exercised subject-matter jurisdiction over Atlas's declaratory judgment claim.

28

**B**

Having determined that the district court properly extended supplemental ancillary enforcement jurisdiction to Atlas's declaratory judgment claim, we next turn to whether Atlas had standing to sue Biowest.  This question is necessarily interwoven with the supplemental ancillary enforcement jurisdictional inquiry.  But to answer this question, we must untangle the state and federal threads that supply the basis of the district court's federal jurisdiction and pinpoint the exact basis on which Atlas's claim rests.  To do this, we start by summarizing the relevant law of standing.  Next, we will explain how federal standing law interacts with state standing law.  Then, we will examine how standing works in the declaratory judgment context.  Next, we will conclude that Atlas indeed had standing to sue Biowest.  And finally, we will consider and dispose of Biowest's sole argument in response to Atlas's standing.

**1**

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const. art. III, § 2).  The doctrine of standing works by "identify[ing] those disputes which are appropriately resolved through the judicial process," and in doing so, assures that federal courts only hear cases consistent with the jurisdictional limits articulated in the Constitution.  *Id.* (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Accordingly, the Supreme Court has described standing as "the irreducible constitutional minimum,"

29

and "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 573 U.S. at 157–58 (alteration in original) (quoting *Lujan*, 504 U.S. at 560–61). As to the injury-in-fact requirement, we have explained, "[t]o satisfy the first of these three elements, a plaintiff must offer something more than the hypothetical possibility of injury. The alleged injury must be concrete, particularized, and actual or imminent." *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016). And for the second element, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (alterations and omissions in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Finally, as to the redressability prong, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* And because "they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same

30

way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

**2**

With this broad sketch of what is required to have Article III standing in mind, we now turn to the wrinkle presented by this suit: the relationship between Article III standing and the state law of standing.  As a leading treatise suggests "for the most part, there is no question.  Standing in federal courts is a matter of federal law."  13B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 3531.14 (3d ed.), Westlaw (database updated June 2022).  But this axiom is not absolute and does not comprehensively answer the question regarding the source of law concerning standing in at least two circumstances where federal courts typically apply state substantive law: that is, under diversity jurisdiction, 28 U.S.C. § 1332; and, as most relevant here, under supplemental jurisdiction.

In particular, we and other courts have understood that the relevant state's law of standing should be applied—in addition to federal standing law—in considering claims in such settings that are derived from state law.  *See City of Moore v. Atchison, Topeka, & Santa Fe Ry. Co.*, 699 F.2d 507, 511 (10th Cir. 1983) ("State law determines who has standing to challenge the constitutionality of a state statute on the ground that it violates a state constitution."); *St. Francis Reg'l Med. Ctr. v. Blue Cross & Blue Shield of Kansas, Inc.*, 49 F.3d 1460, 1465–66 (10th Cir. 1995) (concluding that a state claim before the court through supplemental jurisdiction

31

requires examining "the threshold issue of standing" under state law); *see also Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 693 F.2d 733, 747–48 (8th Cir. 1982) (looking to "Missouri law . . . in order to [determine] standing" to bring a state law claim heard through supplemental jurisdiction); *cf. Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984) ("Whether a complainant is the real party in interest under state law is generally resolved by inquiring whether he or she has standing under state law."); *cf. also Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 47–48 (1933) ("We have assumed, without deciding, that the respondents, though without standing to invoke the protection of the Federal Constitution, will be heard to complain of a violation of the Constitution of the state. Their standing for that purpose, at least in the state courts, is a question of state practice."); *Time Warner Ent. Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1044 (10th Cir. 2004) ("State law claims before a federal court on supplemental jurisdiction are governed by state law." (footnote omitted)).  "Federal concepts of standing developed to regulate enforcement of federal rights do not represent any independent interest of the federal courts that justifies disregarding state law in this context."  13B Wright & Miller, *supra*, § 3531.14.

However, although state standing rules must be met when courts consider state causes of action, "state rules that recognize standing need not be honored if Article III requirements are *not* met."  *Id.* (emphasis added); *see Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000) ("'Standing [under Article III] is, of course, a threshold issue in *every case* before a federal court,' and diversity claims are no

exception. Thus, the jurisdictional deficiency discussed above in connection with the [federal claim] would be equally fatal to the proposed [state claim], which rests on the same speculative injury." (first alteration in original) (citations omitted) (quoting *Wolfe v. Gilmour Mfg. Co.*, 143 F.3d 1122, 1126 (8th Cir. 1998))). Therefore, because the relief sought by Atlas necessarily turns on a question of state law, we must be satisfied that Atlas had standing to bring its claim under *both* the standing doctrine of Colorado and Article III.

Although "Colorado standing jurisprudence does not duplicate all the features of federal standing doctrine," similar considerations underlie both Colorado and federal standing law. *City of Greenwood Vill. v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 436 n.7 (Colo. 2000); *see also Maurer v. Young Life*, 779 P.2d 1317, 1324 n.10 (Colo. 1989) ("Although the federal-court doctrine of standing has a different constitutional basis and is not co-extensive with [Colorado's] standing inquiry . . . , we have previously relied on the standing decisions of the United States Supreme Court for guidance in construing standing principles generally applicable under both the federal and Colorado law of standing." (citation omitted)). The Colorado Supreme Court has noted that "[i]n Colorado, parties to lawsuits benefit from a relatively broad definition of standing." *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004).

Standing in Colorado requires satisfying two requirements. First, similar to federal standing, a plaintiff "must demonstrate that he or she will suffer an 'injury in fact' from the challenged action," and "[i]njuries need not be economic in character;

33

harm to intangible values can satisfy the injury-in-fact requirement." *City of Greenwood*, 3 P.3d at 437. But unlike federal standing requirements, the Colorado Supreme Court has explained that "[o]ur standing doctrine does not require" "an injury that is both 'concrete and particularized,' on the one hand and 'actual or imminent, not conjectural or hypothetical' on the other." *Id.* at 437 n.8. Second, a plaintiff must "demonstrate that the injury he or she has suffered is to a legally protected right." *Id.* at 437. "This is a question of whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation." *Ainscough*, 90 P.3d at 856. "A legally protected interest may be tangible or economic such as 'one of property, one arising out of contract, one protected against tortious invasions, or one founded on a statute which confers a privilege.'" *Id.* (quoting *Wimberly v. Ettenberg*, 570 P.2d 535, 537 (Colo. 1977)). And it "encompass[es] all rights arising from constitutions, statutes, and case law." *Id.*

"These two considerations provide the framework for determining whether the asserted legal basis for a claim—whether constitutional, statutory, or otherwise—can properly be understood as granting [the plaintiff] a right to judicial relief" under Colorado law. *Bd. of Cnty. Comm'rs, La Plata Cnty. v. Bowen/Edwards Assocs., Inc.*, 830 P.2d 1045, 1052–53 (Colo. 1992) (alteration in original) (quoting *O'Bryant v. Pub. Utilities Comm'n,* 778 P.2d 648, 652 (Colo.1989)). Nevertheless, it is important to be aware of the Colorado Supreme Court's admonition that "[a]lthough necessary, the test in Colorado has traditionally been relatively easy to satisfy." *Ainscough*, 90 P.3d at 856.

**3**

Under federal and Colorado law, standing must be assessed in the context of the claim the plaintiff seeks to bring. The sole claim before us is Atlas's declaratory judgment claim. The federal declaratory judgment statute alone does not provide jurisdiction, and, therefore in assessing whether Atlas has standing, we must look to the nature of the dispute and to the "character of the threatened action." *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 197 (2014) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 248 (1952)). Similarly, the Colorado Declaratory Judgment Act creates no rights and is solely remedial. *See Romer v. Fountain Sanitation Dist.*, 898 P.2d 37, 41 (Colo. 1995) ("C.R.C.P. 57 establishes the procedural mechanism for implementation of the Declaratory Judgment Act. C.R.C.P. 57(k) expressly provides that the rule is remedial. The rule neither expressly nor by implication expands the interests of parties, governmental or private, who seek the benefits of the remedy established thereby."). Consequently, like the federal inquiry, in assessing standing under state law in the declaratory judgment context, we look to the nature of the underlying dispute. [5]

_____

[5]  The record reflects some confusion concerning whether the federal declaratory judgment statute, *see* 28 U.S.C. § 2201(a)—as opposed to Colorado's declaratory judgment statute, *see* Colo. Rev. Stat. § 13-51-105—supplies the proper statutory framework for the consideration of Atlas's claim for relief. Atlas's complaint states that "[t]his lawsuit is an action for declaratory relief pursuant [to] Fed. R. Civ. P. 57 . . . ." Aplt.'s App., Vol. II, at 4. Rule 57 says that its "rules govern the procedure for obtaining a declaratory judgment" under the federal statute, 28 U.S.C. § 2201. Fed. R. Civ. P. 57. However, notably, the district court explained that "[t]his claim is apparently brought under Colorado's Uniform Declaratory Judgments Law, Colo. Rev. Stat. §§ 13-51-101, *et seq.*, and Colorado Rule of Civil

Procedure 57." *Atlas II*, 2019 WL 1200809, at \*7. And the district court further noted that "[a]s the Biowest Defendants concede, Plaintiff's First Claim is necessarily a state claim 'since federal ancillary jurisdiction is cited in the Complaint by the Plaintiff as the only basis for this Court's jurisdiction over Plaintiff's claims.'" *Id.* at \*7 n.7. Biowest nevertheless states that the federal declaratory judgment standard should govern. Aplt.'s Opening Br. at 28–29; *see* Aplt.'s Reply. Br. at 10–12. Atlas, on the other hand, argues that the Colorado declaratory judgment standard should apply. *See* Aplee.'s Resp. Br. at 33. Ultimately, dispelling this apparent confusion is not material to our resolution of this appeal. In particular, this minor imbroglio has no impact on the federal jurisdictional questions before us.

As we have discussed, *supra*, the district court acted in this case with federal subject matter jurisdiction—admittedly, jurisdiction of a somewhat unique type, that is, ancillary enforcement jurisdiction, which does not depend on the presence of an independent basis for federal jurisdiction in the instant lawsuit and, in fact, may involve, as here, entirely state substantive law. Furthermore, as for the standing question, the federal and Colorado declaratory judgment statutes, as suggested *supra*, are both strictly procedural—that is, without inherent substantive dimensions. *See, e.g.*, *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937) (noting that "the operation of the Declaratory Judgment Act is procedural only"); *Medtronic, Inc.*, 571 U.S. at 199 ("We have long considered 'the operation of the Declaratory Judgment Act' to be only 'procedural.'" (quoting *Aetna Life*, 300 U.S. at 240)); *Romer*, 898 P.2d at 41. Therefore, irrespective of whether the federal or Colorado declaratory judgment statute was the operative one, our focus in the standing inquiry would be the same: that is, the substantive dispute underlying the declaratory judgment action. In other words, in all events, our focus would remain on determining whether Atlas had standing to litigate its substantive state law claims under the standing requirements of Colorado and federal law.

All that said, we observe that because the declaratory judgment statutes are strictly procedural, a reasonable argument could be made that Atlas was right to reference (albeit indirectly) the federal declaratory judgment statute as the applicable one. That is because in an analogous context, where federal courts apply state law, the Supreme Court explained that "[u]nder the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996); s*ee Utica Lloyd's of Texas v. Mitchell*, 138 F.3d 208 (5th Cir. 1998) (concluding that a party could not rely on Texas's declaratory judgment act to authorize attorney's fees in a diversity case because the statute is not substantive law). However, because the resolution of this question regarding the operative declaratory judgment statute is not ultimately material to our resolution of this appeal, we need not (and thus do not) definitively opine on the matter.

36

**a**

In the declaratory judgment context, the Colorado Supreme Court has explained that "[w]hat is required for purposes of satisfying the standing requirement is that the plaintiff demonstrate that there is an existing legal controversy that can be effectively resolved by a declaratory judgment, and not a mere possibility of a future legal dispute over some issue." *Bd. of Cnty. Comm'rs*, 830 P.2d at 1053. At least in the context of challenging a regulatory scheme, the court has explained that "[t]he injury-in-fact element of standing is established when the allegations of the complaint, along with any other evidence submitted on the issue of standing, establishes that the regulatory scheme *threatens to cause injury* to the plaintiff's present or imminent activities." *Id.* (emphasis added). And, for the legally protected interest, the court explained that "[a]n affirmative answer to this question," "whether the plaintiff's interest emanates from a constitutional, statutory, or judicially created rule of law that entitles the plaintiff to some form of judicial relief," in the declaratory judgment context, means "simply that the party seeking judicial relief has stated a claim by demonstrating the existence of a legal right or interest which has been arguably violated by the conduct of the other party." *Id.* (quoting *O'Bryant*, 778 P.2d at 653).

Under these principles, we conclude that Atlas has standing under Colorado law. First, if the stock transfer between Mr. Kutrubes and Biowest is valid, this would threaten to cause injury to Atlas. As will be discussed further below, the legally effective transfer of the shares to Biowest would hinder Atlas's ability as a

37

judgment creditor to collect on its *Atlas I* judgment, and also the transfer could possibly open Atlas, as the stock issuer, to liability for not properly registering the transfer. As to the second prong, Atlas has a legally protected interest in determining whether the transfer was valid because, at the very least, Atlas has a statutory interest under Colorado law in determining whether it has a duty to register the share transfer. Therefore, Atlas has standing to sue under Colorado law.

**b**

The federal declaratory judgment statute provides that as to "a case of actual controversy within its jurisdiction, . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Put another way, "federal courts can issue declaratory judgments if there is an actual dispute between adverse litigants and if there is a substantial likelihood that the favorable federal court decision will bring about some change." Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES (2011); *id.* ("[D]eclaratory judgments exist so that people can know their rights in advance.").[6]

The Supreme Court has made clear that "an appropriate action for declaratory relief *can* be a case or controversy under Article III." *MedImmune, Inc. v.*

---

[6] "The Declaratory Judgment Act provides that a court '*may* declare the rights and other legal relations of any interested party,' 28 U.S.C. § 2201(a) (emphasis added), *not* that it must do so." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (second emphasis added). "This text has long been understood

*Genentech, Inc.*, 549 U.S. 118, 126 (2007) (citing *Nashville, C. & St. L. Ry. v. Wallace,* 288 U.S. 249 (1933)).  Although predating the modern standing formulation, the Supreme Court in *Aetna Life Insurance Co. of Hartford, Connecticut v. Haworth*, 300 U.S. 227 (1937), generally explained what type of cases are appropriately within a federal court's declaratory judgment power.  Specifically, the Court made clear that "[w]here there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised[,] although the adjudication of the rights of the litigants may not require the award of process or the payment of damages."  *Id.* at 241.

More recently, although recognizing that "*Aetna* and the cases following it do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not," the Court explained, "[o]ur decisions have required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive

---

'to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'" *Id.* (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)); *accord Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 n.17 (1993); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494–496 (1942).  The Supreme Court has explained that it is "'consistent with the statute,' . . . 'to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp.'" *MedImmune*, 549 U.S. at 136 (quoting *Wilton*, 515 U.S. at 289).

character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune*, 549 U.S. at 127 (second alteration in original) (quoting *Aetna Life*, 300 U.S. at 240–41); *see id.* ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941))).

Applying the declaratory judgment "case and controversy" requirements to the Supreme Court's teachings on standing, we turn to whether Atlas has sufficiently alleged it has suffered a sufficient injury-in-fact.  Biowest argues there was no standing because "Atlas was not a party to the Stock Sales Agreement and Assignment between [Mr.] Kutrubes and Biowest . . . and therefore does not have an interest in the contract nor standing to bring the claim."  Aplt.'s Opening Br. at 28–29 (citation omitted).

Although Atlas makes clear in its first amended complaint that it seeks declaratory judgment to answer the question of whether the transfer of Mr. Kutrubes's shares in Atlas to Biowest is void and of no effect, Aplt.'s App., Vol. II, at 16–17, its pleadings are admittedly less clear on what would be the exact injury suffered by Atlas if the transfer was not voided.  It alludes to the fact it "has not received valid instructions to register the purported transfer of [Mr.] Kutrubes'[s] Atlas stock to Biowest," *id.* at 13, and the transfer, therefore, is "void because it was never completed as provided under Article 8 of the [CUCC]," *id.* at 16.  Touching on

40

the question of injury in a somewhat clearer fashion in the same pleading, Atlas does aver that the "[t]ransfer, if completed and not avoided, would render [Mr.] Kutrubes insolvent," and because Mr. Kutrubes "admitted and acknowledged that he would become liable in damages to Atlas in [*Atlas I*]," presumably Atlas would have greater difficulty collecting on that judgment than it otherwise would have because Mr. Kutrubes would be impoverished following the effective transfer of shares to Biowest. *Id.* at 18. However, to the extent that Atlas's amended complaint is somewhat vague about its purported injury, it is not fatally so. We have explained that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Kansas Nat. Res. Coal. v. United States Dep't of Interior,* 971 F.3d 1222, 1231 (10th Cir. 2020) (quoting *Lujan,* 504 U.S. at 561). And Atlas's briefing clarifies the exact nature of its injury.

Specifically, substantially tracking the injuries that the district court identified, *see Atlas II,* 2019 WL 1200809, at *8, Atlas first explains that "[r]esolving whether the writ attached [to] the stock or not is related to Atlas's interests under the writ of attachment" and this would require determining "if the stock was transferred, and to do that, the court had to decide the declaratory judgment issue." Aplee.'s Resp. Br. at 34, 36. Atlas also points out that "[e]ven a contingent liability qualifies as an actual, imminent, and concrete injury sufficient to trigger standing to bring a declaratory judgment action." *Id.* at 37. Next, Atlas argues that it has an interest as the issuer of the stock under Article 8 of the CUCC, and it has a duty to register a transfer "*only* if certain pre-conditions are met." *Id.* at 38. So not only would a

41

declaratory judgment determine whether such conditions have been met, it would also relieve Atlas of "conflicting demands placed upon it: compliance with court orders and enforcement of the writ of attachment on the one hand, and threats from Biowest to litigate on the other." *Id.*

We conclude that Atlas has made a sufficient showing of a cognizable injury. Especially with the result of the trial in *Atlas I*, Atlas has an interest to know whether the transfer was legally effective and, as a result, whether the shares could be used to satisfy the *Atlas I* judgment if they remain possessed by Mr. Kutrubes. That is, if Mr. Kutrubes validly transferred his shares to Biowest, then Atlas's ability to collect on its judgment in *Atlas I* against Mr. Kutrubes is significantly impaired. And similarly, Atlas has a particularized and specific interest in knowing whether it was required to follow the district court's writ of attachment to turn over the shares to Laramie County Sheriff, or if on the other hand, it was required to record the transfer to Biowest who, thus, would have control of the shares in question.

In a roughly analogous context, we have concluded that an insurer could pursue a declaratory judgment claim against another insurer to determine their relative liability for an insurance claim, because the insurer was "not seeking to enforce rights as an insured under the [other insurer's] policy; it is suing . . . insurer-to-insurer. [The insurer] seeks a judicial determination of how *its* policy interacts with the [the other insurer's] policy." *Philadelphia Indem. Ins. Co. v. Lexington Ins. Co.*, 845 F.3d 1330, 1335 (10th Cir. 2017). And we explained that there was standing because "this action is not one to enforce a contract but rather seeks a

42

declaration of the relative rights and duties of [the insurers]." *Id.* at 1336 (alteration in original) (quoting *United Servs. Auto. Ass'n v. Royal-Globe Ins. Co.*, 511 F.2d 1094, 1096 (10th Cir. 1975)).  As we explain further below, the standing determination of *Philadelphia Indemnity* belies the notion that Biowest advances— that is, the idea that just because Atlas has no direct interest in the contractual arrangement between Mr. Kutrubes and Biowest for the share transfer, that it lacks standing to seek a declaration regarding its relative rights regarding this arrangement.

It is true that Atlas's interest in determining whether the share transfer was valid has not yet resulted in an injury.  However, we do not deem this to be a material impediment to a plaintiff possessing Article III standing.  We "have recognized that contingent liability may present an injury in fact." *Protocols, LLC v. Leavitt*, 549 F.3d 1294, 1299 (10th Cir. 2008); *see id.* at 1300 (noting that the Supreme Court found New York had standing to challenge the line-item veto because the President's veto "reviv[ed] . . . a substantial contingent liability [which] immediately and directly affects the borrowing power, financial strength, and fiscal planning of the [plaintiff]" (quoting *Clinton v. City of New York*, 524 U.S. 417, 431 (1998))).

Most relevant here was our discussion in *Protocols* of the Supreme Court's decision in *Aetna Life*.  We highlighted that the Supreme Court has acknowledged that a contingent liability can be a basis for Article III standing in the declaratory judgment context.  *See id.* at 1300.  We observed that the Court had found that the complaint "presented a controversy because the parties 'had taken adverse positions with respect to their existing obligations,'" and a declaratory judgment could

43

"'definitely and finally adjudicate[ ]' the rights of the parties." *Id.* (alteration in original) (quoting *Aetna Life*, 300 U.S. at 242–43). Accordingly, we reasoned that "[b]y holding that Aetna's contingent liability presented a 'controversy' under Article III, the Court necessarily held that standing can be predicated on such liability." *Id.*

Similar reasoning leads us to conclude that a declaratory judgment to avoid contingent liability would provide the basis here for Article III standing. The contingent liability that Atlas seeks to avoid by having the stock transfer declared void through a declaratory judgment action "has created an actual and imminent injury." *Id.* at 1301. Therefore, Atlas satisfies the injury-in-fact element of standing.

**4**

Significantly, Biowest only contests that element—i.e., injury-in-fact. That is likely wise. We independently discern with little difficulty no obstacle to standing stemming from the other elements.[7] So, we center our remaining discussion on explaining why Biowest's injury-in-fact challenge is without merit.

---

[7]    Of course, even absent a specific challenge from Biowest, we must independently ensure that the other elements of standing as to Atlas are satisfied. And they are. The second element requires that "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (alterations and omissions in original) (quoting *Simon*, 426 U.S. at 41–42). We previously determined in *Philadelphia* that where two insurers disputed "their relative responsibilities to pay for [a] loss" from a fire that there was a sufficient causal relation in the sought-after declaratory relief because their "interests are adverse . . . . One insurer or the other will bear the loss or they will share it in some manner." 845 F.3d at 1332, 1335. This is similar to this case because Atlas and Biowest's interest are adverse to one another—that is, determining the validity of the

Biowest argues here, as it did in the district court, that Atlas does not have standing because it was not a party to the contract and, therefore, has no legally enforceable right. *See* Aplt.'s Opening Br. at 28–29; Aplt.'s Reply Br. at 9 ("Under Colorado law, a non-party or beneficiary to a contract lacks sufficient privity of contract and interest to assert a claim on the contract."); *id.* at 11 ("Atlas was not a party to the Stock Sales Agreement and Assignment between [Mr.] Kutrubes and Biowest . . . and therefore does not have an interest in the contract nor standing to bring the claim." (citation omitted)). But these statements reflect a fundamental misunderstanding of what this case is about. Atlas does not claim to be a party or beneficiary to the contract. Instead, Atlas seeks to determine whether the transfer at the core of the contract was valid. The answer to this question determines who

---

transfer will necessarily result in one of them being injured. Therefore, Atlas has satisfied the traceability prong.

Furthermore, as to the redressability prong, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan,* 504 U.S at 561 (quoting *Simon*, 426 U.S. at 38, 43). Again, *Philadelphia* provides guidance. There, we concluded that "[b]ecause Philadelphia's injury is causally connected to how its policy interacts with [the other insurer's] policy, a judicial determination of the insurers' respective responsibilities under the policies will redress and resolve this dispute." *Philadelphia*, 845 F.3d at 1335. Here, this prong is satisfied because if the transfer is found to be valid, then Atlas must certificate the shares and register the transfer; whereas, if the transfer is void, Atlas has no duty to register the transfer and instead may satisfy its *Atlas I* judgment against Mr. Kutrubes (at least in part) through reclaiming the shares.

Therefore, because Atlas meets the three requirements, Atlas has standing to bring this declaratory judgment claim to have the district court determine the respective legal rights of both parties in relation to the share transfer.

exactly owns Mr. Kutrubes's shares and thus whether the writ of attachment actually attached to anything. And it also will decide whether the transfer, if valid, required Atlas to register the transfer of the shares. Therefore, Atlas does not seek the direct benefit of the contract; rather, it seeks to determine whether the contract is valid and affects its rights.

We have concluded, in the declaratory judgment context, that a plaintiff that is neither a party to, nor third-party beneficiary of, a defendant's contract nevertheless has standing to seek a declaratory judgment regarding the contract. In this regard, recall that, in *Philadelphia*, we determined that one insurance company had standing to sue even though it was not a party to or third-party beneficiary of the disputed contract because "[i]ts alleged injury is financial, definite, and concrete" and its "interests [were] adverse" to the opposing party where "[o]ne insurer or the other [would] bear the loss or they [would] share it in some manner." 845 F.3d at 1335. As discussed above, the validity of the contract directly affects Atlas's rights, and, therefore, Biowest's argument that Atlas may not challenge the validity of a contract that it was not party to is unavailing.

\*\*\*

Therefore, we conclude that Atlas has standing to bring this declaratory judgment claim to have the district court determine the respective legal rights of both parties in relation to the share transfer.

46

## C

We next turn to the merits of this case and thus whether the transfer between Mr. Kutrubes and Biowest was valid under Colorado law. We begin by first detailing what Colorado law requires for a stock transfer to be valid. We next turn to the merits of the district court's decision. And finally, we consider three of Biowest's arguments that the district court erred in concluding that the transfer was invalid.

### 1

The Colorado Supreme Court has made clear that "[t]itle to corporate stock in Colorado can only be transferred as provided by statute." *Quandary Land Dev. Co. v. Porter*, 408 P.2d 978, 981 (Colo. 1965). It further explained that "[t]he statutory methods are exclusive and any attempt or desire to convey stock by other means merely results in a naked promise to transfer ownership in the future." *Id.*; *see Mortg. Invs. II*, 93 P.3d at 560 (affirming trial court's conclusion that individual who purportedly purchased shares of the defendant corporation but failed to obtain stock certificates "did not acquire ownership" of the property because he "did not comply with Article 8").

Article 8 of the CUCC governs the transfer of shares in a corporation. *See* Colo. Rev. Stat. §§ 4-8-101, *et seq.*; *see also Mortg. Invs. Corp. v. Battle Mountain Corp.* (*Mortg. Invs. I*), 70 P.3d 1176, 1187 (Colo. 2003) (concluding that Article 8 "governs acquisition of legal ownership of certificated shares of a corporation and generally requires that a purchaser receive the security certificate or certified stock of the corporation"). Most relevant here, "[a] person acquires a security or an interest

47

therein, under this article, if . . . [t]he person is a purchaser to whom a security is *delivered* pursuant to section 4-8-301."[8]  § 4-8-104(a)(1) (emphasis added).  The Comment to § 4-8-301 explains that "[d]elivery is used in Article 8 to describe the formal steps necessary for a purchaser to acquire *a direct interest in a security*."  § 4-8-301 cmt. (emphasis added).

Because Mr. Kutrubes's shares were uncertificated,[9] Article 8 contemplates two ways that delivery could occur.  First, "[d]elivery of an uncertificated security to a purchaser occurs when . . . [t]he issuer registers the purchaser as the registered owner, upon original issue or registration of transfer."  § 4-8-301(b)(1).  Or when "[a]nother person, other than a securities intermediary, either becomes the registered

---

[8]    Section 4-8-104 also contemplates acquiring a security by acquiring a security entitlement.  § 4-8-104(a)(2).  But because this case is about whether Mr. Kutrubes validly transferred the security itself, acquiring a security entitlement is not implicated here.

[9]    Atlas also argues in the alternative that the stock certificates could be deemed certificated because "Atlas's bylaws specified the shares were to be certificated."  Aplee.'s Resp. Br. at 47.  The district court, however, rejected this argument.  *See Atlas II*, 474 F. Supp. 3d at 1193.  In doing so, the court offered the following reasoning: "Atlas admits that it created stock certificates for [Mr.] Kutrubes's shares only after the Purported Transfer took place.  Therefore, [Mr.] Kutrubes's shares were not represented by a certificate at the time of the Purported Transfer.  Accordingly, they were uncertificated securities under the [C]UCC."  *Id.* Atlas fails to show why the district court erred in concluding that the shares were in fact uncertificated.  "'Certificated security' means a security that is represented by a certificate."  § 4-8-102(a)(4).  Atlas does not point to any authority supporting the proposition that the mere statement in a company's bylaws that shares should be certificated means that the shares "were represented by a certificate," even if, as here, no share certificates were printed at the time of the alleged transfer.  Therefore, absent authority to support it, Atlas's alternative ground for supporting the district court's judgment is not sufficiently firm for us to rely on it, and we do not do so.

owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser." § 4-8-301(b)(2).

**2**

Mr. Kutrubes's attempted transfer of his shares to Biowest did not constitute a delivery of uncertificated securities under § 4-8-301. First, in the instant action, neither party disputes that Atlas is the issuer of Mr. Kutrubes's stock, and that it did not register Biowest as the registered owner. *See* Aplt.'s App., Vol. III, at 149. Thus, the district court correctly concluded the first condition was not met. *See id.* at 150. And regarding the second condition, again, Atlas never registered Mr. Kutrubes as the owner of the uncertificated securities on behalf of Biowest. Furthermore, Mr. Kutrubes did not claim to hold his shares on behalf of Biowest.[10] Accordingly, there is no basis for application of the second condition for delivery either. Therefore, Mr. Kutrubes's attempted transfer of his shares to Biowest did not constitute a delivery of uncertificated securities under § 4-8-301.

**3**

Biowest's arguments to the contrary are unavailing. We explain why in the following order. First, we will consider Biowest's argument that common law

---

[10] Mr. Kutrubes own actions further negate such an idea, and further undermine the assertion that the assignment to Biowest was final and irrevocable. Recall that more than one year after the purported transfer, on June 18, 2019, Mr. Kutrubes held himself out as the owner of the shares in his "Request for Inspection and Copying of Corporate Records." Aplt.'s App., Vol. II, at 252–53.

doctrines of property supersede Article 8.  Next, we will examine whether Atlas

violated its duty to register the transfer.  Finally, we consider whether the doctrine of

equitable transfer applies.

**a**

First, Biowest's argument that it owns the shares regardless of whether the

alleged transfer complied with Article 8 fails.  Biowest argues that "the District Court

confuses the distinction between ownership of stock in a corporation and the

subsequent registration of stock on the corporate records of the issuer."  Aplt.'s

Opening Br. at 31; *see id.* ("By analogy, the Article 8 process of registration and

delivery of stock occurs after a sale of shares and is akin to recording a real estate

deed after a property has been purchased.").  In line with this argument, Biowest

contends that the district court incorrectly applied the law of "basic ownership of

property" when it looked to Article 8 because "a present and irrevocable assignment

of [Mr. Kutrubes's] interest in the Shares to Biowest, prior to those Shares being

certificated (after the fact) by Atlas, governs their ownership."  *Id.* at 33–34; *see*

Aplt.'s Reply Br. at 13 ("The assignment constituted a final transfer of [Mr.]

Kutrubes's 7% ownership interest in Atlas to Biowest."); *id.* ("By its plain language,

execution of an irrevocable assignment of interest is sufficient when there are no

actual stock certificates.").

Yet in making this argument, Biowest does little to engage with the reality

that Article 8 governs *the transfer* of ownership; instead Biowest only musters

arguments about evidence of ownership of shares.  In this regard, Biowest quotes

50

several more-than-a-hundred-year-old Colorado and non-Colorado cases about stock certificates not being dispositive of ownership. *See* Aplt.'s Opening Br. at 33 ("[A] 'certificate [of stock] was not necessary to complete ownership. . . . The fact of ownership may be inferred from other facts, in the absence of a certificate.'" (second alteration in original) (quoting *Mountain Waterworks Const. Co. v. Holme*, 113 P. 501, 506–07 (Colo. 1911) (internal citations omitted))); *id.* ("The certificate is not the subject of ownership, but is simply an evidence of ownership." (quoting *Marshall v. Marshall*, 53 P. 617, 619 (Colo. Ct. App. 1898))). Not only do the Colorado cases pre-date Colorado's acceptance of the current CUCC by almost a hundred years, *see id.* at 35, they also illustrate Biowest's attempt to sidestep *the* dispositive issue in the assessment of who owns the shares: that is, whether the *transfer* of ownership from Mr. Kutrubes complied with the CUCC's transfer requirements. Although Biowest does argue that the "[r]evised Article 8 deals with the settlement of securities trades, not the trades or contracts for purchases of securities themselves," *id.* at 36, it points to no authority that anything other than Article 8 governs the transfer of ownership in this case.

As mentioned above, Colorado caselaw and the CUCC itself make clear that the requirements of transfer are not some mere formality but instead are necessary requirements for an interest in stock to transfer. Specifically, the Colorado Supreme Court has made clear that "[t]itle to corporate stock in Colorado can only be transferred as provided by statute," and "[t]he statutory methods are exclusive and any attempt or desire to convey stock by other means merely results in a naked

51

promise to transfer ownership in the future." *Quandary Land Dev.*, 408 P.2d at 981. And the CUCC states that "[a] person acquires a security or an interest therein, under this article, if . . . [t]he person is a purchaser to whom a security is delivered pursuant to section 4-8-301." § 4-8-104(a)(1). The Comment to § 4-8-301 explains that "[d]elivery is used in Article 8 to describe the formal steps necessary for a purchaser to acquire *a direct interest in a security*." § 4-8-301 cmt. (emphasis added).

Biowest's attempt to distinguish authority that the district court relied on also fails. Biowest argues that the district court erred in relying on *Mortgage Investments I*, 70 P.3d 1176, and *Mortgage Investments II*, 93 P.3d 557, because in those decisions "the party seeking to establish ownership of the stock in question never received books and records necessary to prove he was the owner of uncertificated shares" and "evidence was presented there at trial that the corporation's shares were indeed certificated, therefore requiring the application of [C]UCC Article 8 standards with respect to transfer and delivery of certificated shares." Aplt.'s Opening Br. at 31–32. But the fact that Mortgage Investments Corporation's purported owner never received the documentation to show he was the owner of the uncertificated shares, which turned out to be certificated and subject to Article 8's provisions for that class of shares, does not mean the district court erred in concluding that Article 8 governs the transfer here of uncertificated shares.

In sum, Biowest's reliance on common law principles of property and its attempt to distinguish the authority that the district court relied on both fail to

demonstrate that the Article 8 ownership-transfer principles do not govern this stock transfer.

**b**

Putting aside its contention that "the District Court's order erroneously conflated the concept of ownership of stock with registration of shares," Biowest also argues that the district court erred in concluding the "[s]hares were not registered to Biowest as a basis for its ruling that [C]UCC Article 8 was not complied with." *Id.* at 38. This was error by the court, argues Biowest, because, pursuant to Colo. Rev. Stat. § 4-8-401, Atlas had a duty to register the shares to Biowest after "[Mr.] Kutrubes's attorney notified Atlas of the sale, and provided Atlas with a copy of the Assignment executed by his client." Aplt.'s Opening Br. at 39. Further, Biowest argues the district court incorrectly concluded that neither of these communications was sufficient because they did not come from an "appropriate person under Colo. Rev. Stat. § 4-8-107(a), which is the 'the registered owner of an uncertificated security.'" *Id.* at 41. Specifically, it explains that this conclusion ignores "another basic premise of law – that an attorney is the agent of his client." *Id.*

However, as Atlas points out, *see* Aplee.'s Resp. Br. at 51, a duty to register a transfer occurs *only* "if certain preconditions exist. If any of the preconditions do not exist, there is no duty to register transfer." Colo. Rev. Stat. Ann. § 4-8-401 cmt. Among these conditions is that "[t]he . . . instruction is made by the appropriate person or by an agent who has actual authority to act on behalf of the appropriate

53

person," § 4-8-401(a)(2)—which is defined as "the registered owner of an uncertificated security," § 4-8-107(a)(2).

The communications made by Mr. Kutrubes's attorney and Biowest's attorney did not make the correct request and did not come from the correct person respectively. First, the communication from Mr. Kutrubes's attorney simply states that Mr. Kutrubes "transferred [his] stock to a third party, Biowest, LLC" and attached a copy of the "Transfer and Conveyance of Common Stock." Aplt.'s App., Vol. II, at 131–33 (Letter Re: Atlas Biologicals, Inc.—Stock Transfer, dated Apr. 5, 2018). Nowhere does this letter state that Mr. Kutrubes requests that Atlas register the transfer.

And an attached form titled "Irrevocable Stock Transfer Power" leaves blank a line for "[t]he undersigned does hereby irrevocably constitute and appoint . . . an attorney to transfer the said stock on the books of the within named Company . . . ." *Id.* at 134. And, therefore, the form did not designate—and, consequently, did not allow—Mr. Kutrubes's attorney to act as his agent who could instruct that the transfer be registered, even if the attorney had made the proper instruction. The fact that the transfer form was transmitted by Mr. Kutrubes's attorney does not mean that the attorney necessarily had the authority to act as an agent within the contemplation of the CUCC. This is because, § 4-8-401(a)(2) requires actual authority from an appropriate person. Mr. Kutrubes's attorney did not demonstrate to Atlas that he had the actual authority to order registration of the transfer. If anything, the omission of the attorney's name from the stock transfer form creates the opposite inference. So

54

even if Mr. Kutrubes's attorney had uttered the correct instruction for Atlas to register the transfer to Biowest, the instruction would not have been supported by evidence that the attorney had the actual authority to act as Mr. Kutrubes's agent in issuing it.

Similarly, although Biowest's attorney explicitly instructed Atlas "to transfer those shares to Biowest on Atlas's stock ledger," Aplt.'s App., Vol. II, at 150 (Email Re: Atlas Biologicals, Inc., dated Apr. 22, 2018), Biowest was not the registered owner of the shares, and no document was attached that made clear that Biowest's attorney could act as Mr. Kutrubes's agent. Therefore, because neither Mr. Kutrubes's attorney, nor Biowest's attorney was an appropriate person, Atlas had no obligation to register the transfer.[11]

---

[11] Atlas also argues that another prerequisite required to trigger its duty to register was not satisfied because Biowest was not a protected purchaser. *See* Aplee.'s Resp. Br. at 51. A protected purchaser is "a purchaser of a certificated or uncertificated security, or of an interest therein, who: (1) Gives value; (2) Does not have notice of any adverse claim to the security; and (3) Obtains control of the certificated or uncertificated security." § 4-8-303(a). Although Atlas raises reasonable arguments for the first two elements, Aplee.'s Resp. Br. at 52–54, we need not speak definitively to them, because there is no question that Biowest has not satisfied the third prong. Section 4-8-106 defines "control" of uncertificated securities as "(1) The uncertificated security is delivered to the purchaser; or (2) The issuer has agreed that it will comply with instructions originated by the purchaser without further consent by the registered owner." § 4-8-106(c). As discussed above, "delivery" of the uncertificated stock did not, and has not, occurred. And Atlas did not agree to comply with Biowest's instructions. Although Biowest contests the first two elements—as to which we forgo opining upon—it does not raise any arguments that it had control of the shares. *See* Aplt.'s Reply Br. at 24–26. Therefore, focusing on this third element alone, it is clear that Biowest is not a protected purchaser, and, thus, Atlas had no duty to register the transfer on the ground that Biowest was a protected purchaser.

**c**

Finally, Biowest argues that the district court erred in concluding that the doctrine of equitable transfer did not apply to Mr. Kutrubes's attempt to transfer his shares to Biowest. Aplt.'s Opening Br. at 42–44. "Equitable assignment of corporate stock, where there is a transfer of stock even though there is some technical defect in the mode of transfer, is recognized in Colorado." *Mortg. Invs. II*, 93 P.3d at 560. However, "equitable title claims are recognized in Colorado only where the rights of third parties would not be affected." *Id.*; *cf. id.* ("Mortgage Investments was the holder of a deed of trust granted by BMC [i.e., Battle Mountain Corporation]. Its rights would be affected by the sale of the corpus of BMC to Tucker, who then changed the name of the corporation and conveyed and encumbered the property subject to the deed of trust."); *cf. also Sky Harbor, Inc. v. Jenner*, 435 P.2d 894, 897 (Colo. 1968) (ruling that a judgment lien creditor has priority over a person who holds only an equitable interest in the property).

At the outset, we conclude that the equitable transfer doctrine is not applicable here because this case is between a transferee (i.e., Biowest) and a third party (i.e., Atlas). The Colorado Supreme Court has explained "a party may not assert equitable title in a dispute between a transferee and a third party." *Mortg. Invs. I*, 70 P.3d at 1187; *see Arfsten v. Higby*, 372 P.2d 166, 168 (Colo. 1962) (recognizing "equitable titles where rights of third parties are not present"). As Atlas has underscored, the cases where Colorado courts have applied the equitable title doctrine have concerned claims between the transferor and transferee, *see* Aplee.'s Resp. Br. at 55, and those

56

cases make clear that third parties were not involved, *see Arfsten*, 372 P.2d at 168 ("Majority stockholders and corporate officers are not third parties within the protective coverage of the Uniform Stock Transfer Act."). Therefore, application of the equitable transfer doctrine is not appropriate in disputes, like this one, that are not between the transferor and transferee.

Furthermore, in light of the preceding discussion, there should be no doubt that Atlas's rights would be detrimentally affected both as a judgment creditor and as the issuer of the shares. Biowest's only argument to the contrary is that "the transfer of ownership of the Shares from [Mr.] Kutrubes to Biowest occurred upon [Mr.] Kutrubes's execution of the Assignment, which was *prior* to Atlas seeking a pre-judgment attachment (which it obtained without notifying Biowest of the proceedings thereby precluding Biowest any opportunity to challenge the attachment)." Aplt.'s Opening Br. at 44. However, Biowest's argument assumes a valid transfer of the shares that, as we discussed, finds no foundation in the controlling statute, Article 8. Moreover, Biowest points to no authority that supports its suggestion that it matters—for purposes of applying the equitable transfer doctrine—whether Atlas, as a holder of third-party interests, secured the writ of attachment shortly before or after the ostensible transfer of the shares to Biowest. Accordingly, based on the foregoing, we conclude that this is not a suitable case for application of the equitable transfer doctrine and accordingly, Biowest's reliance on it is unavailing.

\*\*\*

57

In sum, Mr. Kutrubes's stock transfer was legally invalid. Therefore, Atlas's writ of attachment was effective in attaching his shares.

## IV

For these reasons, we **AFFIRM** the district court's grant of summary judgment on Atlas's declaratory judgment claim.